## WALLACE SMITH v. THE STATE OF MISSISSIPPI.

1. CRIMINAL LAW. *Instruction. Assumption of facts.*

    It is error, in a criminal trial, to assume, in an instruction for the state, any fact prejudicial to the accused of which there is no evidence.

2. SAME. *Propositions of law. Abstract. Concrete.*

    It is better and safer, in instructions, to tell the jury what facts, if believed by them, would warrant a verdict for the party in whose favor the charge is given, than to submit abstract propositions of law.

3. SAME. *Murder. Intent to kill. When formed.*

    An instruction in a murder case may rightfully predicate guilt of an intention to kill conceived after, as well as before, the accused armed himself.

4. SAME. *Modifications of instructions. Code 1892, § 732.*

    Although the state's theory of the case may have been given in charges granted the prosecution, yet it is not error for the court to so modify an instruction asked by the accused as to incorporate in it the theory upon which a conviction is asked. This is not prohibited by code 1892, § 732, allowing the judge to charge only on the written request of the parties.

5. SAME. *Homicide. Armed for the difficulty.*

    It is error to instruct the jury that the accused is guilty of murder if he was "armed for the difficulty." One whose life has been threatened, and who may be expecting an attack in consequence, has the right to arm himself for defense.

6. SAME. *Provocation. Words.*

    The words of a decedent cannot alone constitute legal provocation for killing him.

7. SAME. *Provoking difficulty. Abandonment of it. Rights restored.*

    One who provokes a difficulty may be restored to the right of self-defense if he, in good faith, abandons the conflict and is thereafter murderously assaulted by his adversary.

8. SAME.  *Evidence.  Character of deceased for violence.*

Where there is evidence showing, or tending to show, that the defendant acted in self-defense, under reasonable apprehension that his life was in danger or that he was in danger of great bodily harm, because of some act of deceased done at the time of the killing, or if the evidence in respect to the homicide tending to prove defendant's guilt is wholly circumstantial, and the violent character of the deceased is in doubt, evidence of such character of deceased, if known at the time to defendant, is admissible, there being some evidence to show, or tending to show, that the deceased made the attack; and defendant's own testimony as a witness may be the predicate for such evidence.

9. SAME.  *Right to procure and carry arms.*

If there be evidence to show the defendant procured the gun with which the homicide was committed, for an innocent purpose, and testimony also to show that deceased threatened defendant's life, it is error to refuse an instruction asked by accused that if he procured the gun for the innocent purpose, or if, a short time before the conflict, deceased had threatened the life of the accused, then defendant, in either case, had the right to procure and carry the gun.

10. SAME.  *Verdict.  Uncertainty.  Mercy of court in capital case.*

If the jury, although instructed as to the effect of the verdict they may render against the accused on trial for murder, return a verdict of guilty, accompanied with a recommendation of mercy to the court, the court should make inquiry as to the meaning of the verdict, and have the jury clear up their finding.  *Penn* v. *State*, 62 Miss., 450, explained.

FROM the circuit court of Lauderdale county.

HON. G. B. HUDDLESTON, Judge.

The appellant, Wallace Smith, was convicted of the murder of one J. T. Jemison, was sentenced to be hanged, and appealed to the supreme court.   The facts are sufficiently stated in the opinion of the court for an understanding of the case.   The instructions referred to in the opinion, and the presentation of which is deemed necessary to a clear conception of the opinion, are as follows :

Those for the state are:

" 3. If the jury believes from the evidence, beyond a reasonable doubt, that, shortly before the difficulty, Smith hired a · gun, loaded it, and went about town making threats against the life of Jemison, and that he went to where Jemison was standing, called him aside, and provoked the difficulty by cursing Jemison and by attempting to draw his gun on Jemison, and that such conduct on the part of Smith compelled Jemison to draw his pistol, and shoot, to protect his life or person from great bodily harm at the hands of Smith, and, thereupon, Smith shot and killed Jemison, then Smith is guilty as charged, if the jury further believe the shooting on the part of Smith was done with a deliberate design to effect death.''

" 5. The court charges the jury that if they believe, from the testimony, beyond every reasonable doubt, that Smith threatened the life of Jemison on the day of the homicide, and shortly preceding the difficulty, and that, in pursuance of these threats, armed himself with a loaded shotgun, and went in search of Jemison for the purpose of provoking a difficulty with him, intending to kill Jemison in said difficulty in the event Jemison refused to do what Smith required of him, and that Smith finally found Jemison, and that a difficulty, brought on by Smith, did ensue very shortly after Smith and Jemison met, and that during said difficulty Smith shot and killed him, with a shotgun aforesaid, then Smith is guilty of murder, even though the jury believe, as a matter of fact, Jemison fired the first shot, and the jury should so find.''

" 8. If the jury believe, from the evidence, that the defendant hired the gun, and bought the cartridges, intending to seek and find deceased, and provoke a difficulty with him, and, in said difficulty, to use said gun to slay and overcome him, and that, pursuant to such intent, did seek and find him, and did by word or act provoke a difficulty with deceased, in which difficulty he (defendant) did kill deceased, then he is guilty as charged, though deceased fired the first shot, and the jury should so find.''

"9. If the jury believe, from the evidence, beyond a reasonable doubt, that Smith's conduct at the time of the difficulty was such as to compel Jemison to act in necessary self-defense in drawing his pistol and shooting Smith, then, under the law, Smith is estopped from defending himself from the assault of Jemison by killing Jemison."

The instruction asked by defendant and modified by the court is as follows :

"2. If the jury believe, from the evidence, that Smith ∧ was assailed by Jemison by drawing his pistol and shooting at him (Smith), and if the jury further believe that said shot by Jemison took effect in the arm of Smith, and that Smith returned the fire and killed Jemison, then such killing was justifiable, and the jury should acquit.   And if the jury further believe that after Jemison had shot Smith, ∧ and after Smith had shot Jemison, and after Jemison had left the sidewalk and was advancing into the street, that Jemison's conduct, either by firing his pistol or holding it in a position to fire, or by doing any other act which indicated an intention to use a deadly weapon and do Smith some great bodily harm, and Smith believed that he was in danger by the use of such weapon, then Smith was justifiable in killing Jemison, and the jury should so find."

The court modified this instruction by inserting after "Smith," in the first line, as indicated by the caret, the words "not being armed for the difficulty, or not provoking it," and by adding in the seventh line, after the word "Smith," as indicated by the caret, the words "Smith not being armed for or provoked the difficulty."

The instructions asked by defendant, and refused, are as follows:

"11. The court charges the jury that even though the defendant called Jemison a ' son of a bitch,' or used any other insulting words, yet those words would not, nor would any other words, amount to such provocation as to deprive defendant of the right of self-defense.

"12. The court instructs the jury that if they believe, from the evidence, that defendant procured the gun to go bird hunting, or if they believe, from the evidence, that, a short time before the difficulty, deceased threatened to kill the defendant, then the defendant, in either case, had a right to procure a gun and carry it."

*S. A. Witherspoon*, for appellant.

The third charge is erroneous because it states, as one of the conditions on which Smith lost the right to defend himself, that Smith hired a gun and loaded it. To hire a gun and load it is a lawful act, and is not one of the conditions on which a man must submit to being killed. The third charge is erroneous in submitting to the jury the proposition that Smith went to Jemison and called him aside and provoked the difficulty with him, because the proof shows that Smith did not do this, and there is not sufficient evidence to authorize the jury to find that he did. The third and ninth charges for the state are both erroneous in stating to the jury that Smith is guilty, notwithstanding he killed Jemison in self-defense, if his conduct was such as to compel Jemison to shoot to protect himself. The vice of these charges is that they fail to give the jury any guide as to what sort of conduct, on the part of Smith, would entitle Jemison to shoot him, and that they leave the jury to determine, according to its own notion of the law, whether or not Smith's conduct was such as to authorize Jemison to kill him.

The third charge for the state is not only incorrect in its statement of each one of the conditions on which the right of self-defense was lost, but the combination of all of the conditions stated do not authorize the conclusion drawn therefrom in the charge that Smith was guilty. All of said conditions may have existed, and yet Smith had the right to defend himself. If Smith hired the gun and loaded it for the purpose of going hunting, as the state proved that he did, and if Smith went around town making threats against the life of Jemison, and if

those threats were idle words which he did not intend to exe-
cute or were a mere joke, or if he did purpose to kill Jemison
and abandoned such purpose before the difficulty, as his con-
duct in the difficulty clearly showed, or if the threats were con-
ditional and not absolute, and were merely evidence of a pur-
pose to shoot Jemison in case Jemison should try again to kill
him, as he had done, then all the conditions of the charge would
be true, and yet Smith would not have lost the right to defend
himself, although the jury, in its great wisdom and in its as-
sumed knowledge of the law, may have thought that such " con-
duct on the part of Smith compelled Jemison to draw his pistol
and shoot to protect his life or person from great bodily harm
at the hands of Smith.''

The fifth charge was erroneous in stating, as one of the con-
ditions on which the right of self-defense was lost, that Smith,
in pursuance of these threats, armed himself with a loaded shot-
gun and went in pursuit of Jemison.    There is not a syllable
of testimony that Smith armed himself in pursuance of these
threats.    The fifth charge is erroneous in stating that the diffi-
culty was brought on by Smith.

The eighth charge for the state is erroneous in submitting to
the jury the proposition that Smith hired the gun and bought
the cartridges, intending to seek and find Jemison and provoke
a difficulty with him, and, in such difficulty, to use said gun on
Jemison.    They accidentally met on the sidewalk.    As he did not
seek him at all, he did not seek him with the intent described
in the eighth charge, and there is no testimony to support such
a charge.

The charges for the state, and the modification of the charges
requested by the defendant, are not only erroneous for the
reasons already given, but also because they are in conflict
with the charges for the defendant.  On the one hand, the court
told the jury, in substance, to acquit Smith if he shot Jemison
in self-defense, while, on the other, the jury is told that the plea
of self-defense is cut off by the conditions named.    In view of

this conflict, the jury could not tell what they ought to do, and had no rule to guide them.

In the modification of the second charge the jury is told, in effect, that either one of two conditions will cut off the plea of self-defense. If Smith was "armed for the difficulty," or if he provoked it, either act, according to the instruction, required him to submit to being killed. This is not the law. What does "armed for the difficulty" mean? Does it mean if he had procured the gun to use it in the difficulty in slaying Jemison or committing a felony upon him, or in striking him with it, or that he just happened to have a loaded gun, and was thereby prepared to defend himself in the difficulty? Whatever it means, it was not sufficient to cut off the right of self-defense, nor is there a line in any law book which countenances such a doctrine. Neither does the act of provoking a difficulty by itself cut off the right of self-defense. He may have provoked the difficulty, and yet, if, when he did it, he did not intend to do Jemison some bodily harm, and had not procured the gun for such purpose, he had a right to defend himself.

In conclusion, I insist that the court erred in receiving the verdict of the jury. When the jury returned their verdict it was apparent, from the wording of the same, that the jury did not understand what they were doing. They found him guilty of a crime for which the only punishment is death, and at the same time recommended him to the mercy of the court. It was absurd to recommend mercy when the other clause of the verdict excluded the possibility of mercy. The last clause cast a cloud upon the verdict contained in the first clause, as was said in *Penn* v. *State*, 62 Miss., 450. I do not contend that the legal effect of the verdict was different from what the lower court held, nor do I deny that the last clause of the verdict, after it has been accepted by the court without error, is surplusage. But I do insist that when a verdict is presented to the court in doubtful, ambiguous or "cloudy" terms, it is error for the court to refuse to ascertain the meaning of the doubtful

words, to dispel the cloud. In the case of *Penn* v. *State, supra,* the verdict was in substantially the same words, but the defendant in that case did not ask the court to inquire the meaning of the verdict, and it was received without objection or exception from the defendant.

*W. N. Nash,* attorney-general, for the state.

The jury having responded to the issue of fact, returned into court the following verdict: "We, the jury, find the defendant guilty as charged in the indictment, and recommend him to the mercy of the court." The court's attention is called to the fact that the jury was specially and fully instructed as to the kind of verdict they should render. In a similar verdict to this, in the case of *Penn* v. *State,* 62 Miss., 450, this court said: "The most probable suggestion is that the addition was made to meet the views or wishes of some of the jury." In this case of Penn's, the jury trying the indictment for murder, returned a verdict in these words: "We, the jury, find the defendant guilty as charged in the indictment, and plead the mercy of the court." The jury was polled. Each juror was asked, "Is this your verdict?" and each responded, "It is." Held, that the verdict was good, and the words, "plead the mercy of the court," were mere surplusage. In the case of *Traube* v. *State,* 56 Miss., 153, the verdict rendered was: "We, the jury, find the defendant guilty of manslaughter in the second degree." The court held the words of the verdict, "guilty of manslaughter," were a full and complete finding of the issue submitted, and properly treated the superadded words, "in the second degree," as surplusage. On a trial for manslaughter, evidence of the general character and habits of the deceased, as to temper and violence, cannot be received. 8 Ired., 344. The only exception to this rule, if there be one, is where the whole evidence as to the homicide is circumstantial. 8 Ired., 344.

The instructions for the state are substantially correct, and, when viewed as a whole, are without error.

Argued orally by *S. A. Witherspoon*, for appellant, and by *W. N. Nash*, attorney-general, for the appellee.

WHITFIELD, J., delivered the opinion of the court.

The fifth instruction for the state is erroneous in two particulars. There is no evidence that Smith made any threats before he procured the gun. It was therefore improper to charge that if the jury believed he "armed himself in pursuance of the threats." Again, the language "in the event Jemison refused to do what Smith required of him," finds no support in the testimony. The necessary effect of the language is to say to the jury: "If you believe Smith, at the time of the killing, required Jemison to pay the twenty-four dollars gambling debt, or part of it, intending to kill him on refusal to so pay," etc., "you will find him guilty of murder." The only evidence on this point is that Jemison told Smith Monday morning that he had no money in the bank on which the check was drawn, and that Smith then said to Jemison he would destroy the check, and then tore it up in his presence; and Smith's testimony that he said to Jemison, as they walked around the corner together, with Smith's right hand on Jemison's shoulder, "Col. Tom, can I get as much as two or three dollars from you? I need it;" and that immediately, as Smith testifies, Jemison cursed him, struck him and attacked him. This falls far short of showing that Smith at that time required Jemison to pay the two or three dollars, intending to kill him if he did not. The other testimony that Smith had said that Jemison had robbed him, is coupled with the further statement, made at the same time, that Jemison had threatened to kill him, and had sworn he would kill Smith, and that no man could treat him (Smith) that way and live, and related thus to Jemison's whole conduct towards Smith, as Smith detailed it, and not to the mere debt matter. And all the other evidence as to the threats, as to Smith's procuring the gun, and, while having the gun, having threatened to kill Jemison, and having sought for Jemison, and

having killed him when found, he (Smith) provoking the diffi-culty, and as to this being murder, had been abundantly charged on, and correctly, in that phase of the case.

The vice of this language is that it selects and singles out and predicates guilt upon Smith's requiring Jemison, at the time, to pay the debt, or part of it, or be killed if he refused to do that, when the testimony does not show he did, at the time, require any such thing. There must have been testimony that such particular requirement was made by Smith, intending to kill Jemison if the requirement was not complied with, if guilt is to be predicated on that particular state of facts. The in-struction does not set out what was said or done, at the time, in the nature of a requirement of any kind, but assumes Smith required something to be done—'' what was required of him [Jemison],'' says the charge—without testimony that anything was there required to be done by Jemison, on the failure to do which Smith would kill him. On the new trial the charge can be purged of these errors.

The ninth instruction for the state is objectionable as being an abstract charge as to what would deprive Smith of the right of self-defense, when the court had put that doctrine fully in the better form, the concrete form. It was better and safer to tell the jury what facts, if believed by them, would, in law, de-prive Smith of the right of self-defense, than to submit that matter to them in this abstract way. The safe paths are the best in drawing instructions.

We do not think, on the facts of this case, the third and eighth charges for the state are open to the objections urged to them. The principle of these instructions is that Smith would, in the case stated in them, be guilty of murder, not only if he had procured the gun, intending when he procured it to kill, etc., but also if, having procured the gun, without such inten-tion originally, he, while armed with it, then conceived such intention, made the threats, followed them up by killing, etc. We think *Long* v. *State*, 52 Miss., at page 38, sustains the view

of the learned circuit judge. And for the same reason we think the court's modifications of the defendant's third, fourth, fifth, and ninth charges were, on the facts of this case, correct. The modification of the ninth charge could have been more clearly put.

The court's modification of the defendant's first charge was also correct. The complaint as to these modifications, that the court had already presented the state's theory in the state's charges, and should not have tacked onto the defendant's charges these modifications, is not tenable, under our practice of prohibiting the judge from charging the law of a case in one whole and harmonious written series of charges, and substituting the practice of only allowing him to charge on the written request of the parties.

The modification of the second charge asked by defendant is fatally erroneous. It announces the rule that the defendant was guilty of murder if he was merely "armed for the difficulty." One whose life has been threatened, and who may be expecting an attack in consequence, surely has the right to arm himself for defense against such an attack, yet the modification denies this, and cuts off the right of self-defense in such case. The other part of the modification, "or not provoking" the difficulty, is unintelligible in view of the language of the instruction, which goes upon the theory that Jemison was the "assailant." It puts Smith's justification on the ground that "if the jury believe," etc., that "Smith was assailed by Jemison by drawing his pistol," etc. How could the jury believe that "Smith was assailed by Jemison," and also believe that Smith provoked the difficulty by assailing Jemison? The words of Smith could not constitute legal provocation for Jemison's killing Smith. The idea in the charge is that if Jemison began the difficulty, etc., and Smith did not. It turns upon the question, who made the first overt act? The idea in the mind of the court must have been that if Smith in any way provoked the difficulty, using such provocation as a cover for his intent

to kill, in order to make Jemison commit some overt act, and then kill Jemison, he would be guilty; but the modification does not so state. Again, it is further true that one may provoke a difficulty and, in good faith, abandon it, and then be turned on murderously by his adversary. Merely provoking the fight—which fight, on the case stated above, a party had abandoned in good faith—would not cut off the right of self-defense. The party provoked in such case must not go beyond his own defense, and kill one who has, in good faith, given up the fight. We mean to intimate no opinion as to whether, on the facts of this case, Smith had, at any time, abandoned this fight, but are merely pointing out the fact that the modification makes the charge unintelligible on the theory on which it was drawn, and was without the qualifications essential to the correctness of the modification.

The eleventh instruction asked by the defendant should have been given, as should also the twelfth instruction. There is much testimony by different witnesses of Smith's declaration that he got the gun to go bird hunting, and he so swears. Simmons, a state witness, who was with him nearly all the time, testifies to these declarations, and that he heard no threat against Jemison. On this testimony, which he had a right to submit to the jury, and which was submitted to the jury, he was entitled to the charge. The jury may not have believed this. They may have believed that, staying in town, as he did, and not going hunting, as he said he intended to do, he never meant to go hunting, but was really using that as a pretext. But that was for them, as all other facts, and, the testimony being in, as we have stated, he was certainly entitled to the law announced in the charge.

The thirteenth, fourteenth, fifteenth, and sixteenth charges asked by the defendant were, on the facts of this case, properly refused. The fourteenth does not follow the language of the witness. Its language is that defendant shot Jemison, "while Jemison had his pistol drawn"—not "after Jemison had

tackled him.'' Jemison might have had his pistol drawn in self-defénse, not having tackled Smith at all.

With the exceptions indicated, the charges are correct, and we have thus fully gone over all the numerous charges given both sides, that, on the new trial, the court below may have a proper guide.

The defendant offered to show by the testimony of a number of witnesses, and by himself, that Jemison went armed habitually, and that his general reputation was that of a violent and dangerous man, and that all this was known to defendant. There is the greatest uncertainty on the testimony of record, as to who, at the time of the difficulty, made the first overt act towards beginning it. Several witnesses testify that when they first saw the gun it was on Smith's shoulder pointing backwards, and that he immediately reached up and brought it to a position where it was pointing up, and immediately after threw it on Jemison and fired his first shot. But they do not testify that they heard or saw the beginning of the difficulty. They did not see when Jemison drew his pistol, and they all testify that Jemison shot Smith before Smith shot Jemison. Several witnesses testify that Jemison struck Smith with his left hand, jumped back—some say about ten feet—and shot first. A large number of witnesses testify that Jemison shot twice before Smith shot, and one thinks three times. Not a single witness saw when Jemison drew his pistol. There are two witnesses who do testify on this point as to who began the difficulty, by the first overt act—Dabbs and Smith. According to Dabbs, Smith clearly made the first overt demonstration. According to defendant, Jemison clearly made the first overt demonstration. Their testimony is in direct and irreconcilable conflict.

The rule is perhaps stated as well as it can be in 5 Am. & Eng. Enc. L. (2d ed.), p. 872, in these words: '' When there is evidence showing, or tending to show, that the defendant acted in self-defense, under reasonable apprehension that his life was in danger, or that he was in great danger of bodily harm, be-

cause of some act of the deceased, done at the time of the kill-
ing, or if the evidence in respect to the homicide tending to
prove the guilt of the defendant is wholly circumstantial, and
the character of the slaying is in doubt, evidence of the bad
character of the deceased, in this respect, is admissible.'' And
the authorities are quite fully marshaled in the notes from most
of the states, including our own.    One may not be killed simply
because he is violent and dangerous, for the violent as well as
the peaceable are within the protection of the law.    But the
very soul of self-defense is that the defendant had reasonable
ground to apprehend death or great bodily harm at the hands
of his adversary.    And one of the elements entering into the
reasonableness of such apprehension is the character of such ad-
versary as a violent, vindictive, and dangerous man, known to
be such to the defendant.    In *Spivey* v. *State*, 58 Miss., 866, the
qualification is added that there must be some testimony show-
ing that the deceased made the attack.    Now, here Smith's testi-
mony abundantly shows such attack.    Whether that was true or
false was a question for the jury.    But he, having so testified, and
being, under the statute permitting him to testify, a witness as
much as any other witness in the case, the qualification in the
Spivey case is met.    The doctrine above announced in Am. &
Eng. Enc. L. is fully sustained by *Cotton* v. *State*, 31 Miss.,
504; *Spivey* v. *State*, 58 Miss., 866; *Moriarty* v. *State*, 62
Miss., 654; and *King* v. *State*, 65 Miss., 576.    See, espe-
cially, King's case and Spivey's case.

In *Hart* v. *State*, 38 Fla., 39—a case where there was no
testimony, save that of the defendant, showing any attack by
deceased—it was expressly held that, the statute making the de-
fendant a competent witness, his testimony alone is enough to
lay the predicate for the admission of proof of the violent char-
acter of the deceased.    This is the necessary result of the stat-
ute giving him the status of a competent witness.    Testifying
to the attack, this testimony is for the jury alone to pass upon
as to its truth or falsity; but, if it shows an attack, it makes

this character of testimony just as competent, as matter of law, as would the testimony of any other witness. It was held in King's case, *supra*, that testimony (the proper predicate being laid) that the "deceased habitually went armed with concealed deadly weapons, and that appellant was cognizant of this fact, and that the deceased was generally reputed, in the community in which he lived, to go so armed, and that this was known to appellant," should have been admitted. Under the testimony in this case and these authorities, we think the court erred in excluding the proffered testimony. It was proper to go to the jury, to be given by them such weight as they thought it entitled to in "exhibiting," in the graphic language of Judge Campbell, in Spivey's case, *supra*, "the deceased before the jury, just as he confronted the defendant when he shot him."

The jury returned the following verdict: "We, the jury, find the defendant guilty as charged in the indictment, and recommend him to the mercy of the court." They had been fully charged that a verdict of guilty would result in the death sentence, and that, if they desired him imprisoned in the penitentiary for life, they should so state in their verdict. And the verdict, in view of this, is certainly extraordinary. Appellant's counsel insisted that the court should ask each juror what he meant by the words, "recommend him to the mercy of the court," and the court refused to do so. Appellant's counsel then asked the court to allow him to propound that question, and this the court declined to do, and appellant excepted, and insists that it was error in the court not to have this ambiguous and clouded form of verdict explained, so that the jury might be permitted to render a verdict which, in form, would express their exact finding. Ten of the jury filed an affidavit, setting out that each member of the jury agreed that the defendant ought not to be convicted of any offense for which he should either be hung or sentenced to the penitentiary for life, but that he ought to be imprisoned in the penitentiary for a term of years, according to "the mercy of the court," and that they

believed the legal effect of the words, "recommend him to the mercy of the court," would be to send the defendant to the penitentiary for a term of years, and that no member of the jury would have returned the verdict they rendered if they had known that the effect of it would be to sentence the defendant to death.

We do not think we can regard this affidavit, since its effect, indirectly, at least, would be to impeach the verdict. But the question remains whether, in a capital case, the court, upon the request made, should not have exercised the power it undoubtedly had, of asking the question and having the jury clear up their finding. The jury was polled in the ordinary form, but this, of course, did not meet the difficulty. The learned circuit judge was, we suppose, misled, and very naturally, by the language of the court in *Penn* v. *State*, 62 Miss., 477, to the effect that "as the jury was polled, and counsel could not have had anything more than that done if present," no harm resulted to the accused. But that was said with reference to the point there made—that the jury were polled in the absence of counsel for the defendant. As the only thing there insisted upon was the mere polling of the jury, in the ordinary form, and as the court did that thing, of course as to that point no prejudicial error was committed. But in that very case it was held that it was "proper" for the court to have inquired of the jury what was meant by the addition to the finding of guilty the words "and plead the mercy of the court," and the court expressed the wish that this "apparent cloud upon the verdict had been dispelled." In *Shine* v. *State*, 42 Miss., 333, it was held that, "where a verdict is uncertain, ambiguous, or informal, the court has the most unquestionable right to direct the jury to correct the form of their verdict before discharging them." There, in a prosecution for grand larceny, the jury had failed to find the value.

*Gibson* v. *State*, 38 Miss., 310, 311, is directly in point. That was an indictment for assault and battery with intent to

kill and murder. The verdict was: "We, the jury, find the accused guilty of an attempt to commit manslaughter, but earnestly recommend him to the mercy of the court, believing that the higher penalties inflicted for the actual committal of such offenses would be more severe than the circumstances attending the case would require." The court asked the jury "if they found the accused not guilty of an assault and battery with intent to kill and murder, and found him guilty of an assault in the attempt to commit manslaughter," to which they responded, without being polled, in the affirmative, and the verdict was entered in accordance with this verbal response. Afterwards appellant moved to have the first verdict entered as rendered. The court overruled the motion, and the defendant excepted, and this court said (page 311): "The entry in the record is in accordance with the ascertained views of the jury, and it was competent to make such inquiry as would enable it to comprehend the will and intention of the jury in reference to their finding, when, in the opinion of the court, there was any doubt or uncertainty in the language employed by them." The thing to be "ascertained" is "the will and intention of the jury" in their finding. That is what the court should know, that the proper sentence of the law may follow upon their actual finding, not upon what is not their actual finding. Of course the legal effect of the verdict in this case, in the words used, is, by legal construction, death. But the words employed in a verdict are the mere vehicles for conveying the jury's will; and where there are words in the verdict raising an "apparent cloud" as to what the actual intent and finding of the jury is, the court, whether asked or not, should "dispel that cloud," and have the jury make plain their meaning. And the court, of course, had the amplest power to do this, and, if necessary, to send them back to the jury room to render a clear and unambiguous verdict; and most especially should this ample power be exercised in a capital case.

We think the court should have asked the question, and fully

exercised its undoubted power to clear up the verdict, and that it did err in not doing so.

*Reversed, new trial granted and remanded.*